IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

IN RE:                                                     )
LONNIE DALE COX and DENA GAY COX     )        Case No. 07-21407
                                                                )
                           Debtors.                    )

**MEMORANDUM OPINION**

This matter is before the Court on the motion of the Chapter 13 Trustee to deny confirmation of the Debtors' Chapter 13 plan. The trustee has objected to the plan on the grounds that it fails to comply with § 1325(b) in that Debtors' plan does not propose to pay to unsecured creditors the amount required by § 1325(b) as reflected on Debtors' Form 22C. Debtors respond that they are proposing to pay to their unsecured creditors as much as they can afford, as reflected by their schedules of income and expenses, and denial of plan confirmation under the circumstances would violate the equal protection requirement of the due process clause of the Fifth Amendment to the United States Constitution. This is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(L) over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a) and (b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, the Court overrules the Debtors' objection to the trustee's motion and sustains the trustee's objection to confirmation.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Debtors originally filed a petition for relief under Chapter 7 of the Bankruptcy Code on September 13, 2007. On November 20, 2007, the United States Trustee filed a statement suggesting that the filing was an abuse of the provisions of the Bankruptcy Code and on November 29, 2007, filed a motion to dismiss the case pursuant to 11 U.S.C. § 707(b).

Thereafter, the Debtors filed a motion to convert the case to a proceeding under Chapter 13, which this Court granted on January 25, 2008. The Debtors then filed a Chapter 13 plan and conversion schedules. On their Schedule I, Debtors show income of $4,774.30. Schedule J lists expenses of $4,652.07, leaving net monthly income of $122.23. Debtors have filed a plan in which they propose to pay that sum to the trustee for a period of 55 months. According to the plan, unsecured creditors will receive whatever is left over after the required payments to secured creditors and priority claimants. Debtors also filed a Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income, Official Form 22C. According to that form, their current monthly income is $7,500.90. Because, when annualized, that figure equates to an income of $90,010.80, which is in excess of the $72,800.00 median income in the state of Missouri for a family of similar size, Debtors completed the remaining portion of Form 22C showing deductions of $6,597.98. Debtors' disposable income is thus $902.92.

On March 15, 2008, the trustee filed a motion to deny confirmation of the plan alleging among other things that: the Debtors' plan failed to meet the requirements of § 1325(b) in that the plan did not propose to pay to the Debtors' unsecured creditors the entire amount of their disposable income of $902.92 as shown on Form 22C; the plan was not filed in good faith in contravention of § 1325(a)(3) because Debtors, although above median and with disposable income, proposed to pay little to their unsecured creditors under the plan; the treatment of certain secured creditors was unclear because they were listed on Schedule D as secured, but not so treated in the plan; and one creditor, alleging to be secured, American General Services, had objected to confirmation. Debtors responded by alleging that: the objection to confirmation had been resolved; they did not purport to treat certain creditors shown on Schedule D as secured

2

because their liens were subject to avoidance and motions to that effect had been filed; and they proposed to pay all they could afford, as shown on Schedules I and J for the appropriate period, were unable to pay the amount shown on Form 22C and that requiring them to do so under the circumstances would violate the equal protection provision of the due process clause of the Fifth Amendment of the United States Constitution.  An amended motion to dismiss was subsequently filed in which the trustee claimed that Debtors failed to provide sufficient payment advices.  Debtors' response to that motion alleged that the required income information had been subsequently provided.  At this point, the only remaining issue for the Court is the Debtors' constitutional challenge to the trustee's objection to the plan on § 1325(b) grounds.

## II.  DISCUSSION AND ANALYSIS

### A.  Projected Disposable Income

Perhaps the most significant and difficult changes made to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") are those relating to the determination of disposable income for Chapter 13 debtors.  Prior to the enactment of BAPCPA, the Court determined the debtor's projected disposable income by deducting from the income shown on Schedule I, the expenses shown on Schedule J, subject to the court's review for the necessity and reasonableness of those expenses.  The resulting number constituted the amount to be paid to the Chapter 13 trustee pursuant to the plan.  Upon objection by the holder of an unsecured claim or the Chapter 13 trustee, the debtor could obtain confirmation of a Chapter 13 plan only by demonstrating either that the unsecured claims were being paid in full or the debtor was committing all disposable income to make payments into the plan for a period of no less than 36 months.  Plan payments could not extend beyond five years.  BAPCPA made

changes to many of these provisions and has ushered in an entirely different world.

Under BAPCPA, upon objection, if the debtor is not paying all unsecured creditors in full, the plan must provide that all projected disposable income received in the applicable commitment period be applied to make payments to unsecured creditors under the plan. § 1325(b)(1)(B). The applicable commitment period for debtors with incomes above the applicable median for similar household sizes is five years. § 1325(b)(4)(A)(ii). Projected disposable income is not defined, but BAPCPA contains a new definition of the phrase "disposable income." In § 1325(b)(2) the phrase is defined as current monthly income received by the debtor (minus certain designated payments) less amounts reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor. § 1325(b)(2)(A). The concept of "current monthly income" is itself a defined phrase meaning essentially, the average monthly income the debtor received from all sources during the six-month period prior to the date of the filing of the petition, with certain exclusions. § 101(10A). In addition, the Code now specifies that the reasonable and necessary expenses to be deducted from current monthly income to determine disposable income are, for debtors above the applicable median, to be determined in accordance with § 707(b)(2). § 1325(b)(3). The expense allowances identified in § 707(b)(2) are the National and Local Standards employed by the Internal Revenue Service in assessing offers in compromise made by delinquent taxpayers. The standards are designed to create objective allowances or limitations on categories of recurring expenses in order to assess what surplus might exist for application to the delinquent tax debt.

As this Court has observed previously, these changes have generated a tremendous amount of litigation as courts have attempted to interpret their meaning. While several different

schools of thought have developed, the Eighth Circuit Bankruptcy Appellate Panel in its recent decision in *Coop v. Frederickson*, 375 B.R. 829 (8th Cir. B.A.P. 2007) adopted the position that the calculation resulting from the completion of Form 22C is dispositive for above-median debtors.  In *Frederickson*, the Bankruptcy Appellate Panel adopted what it called the "plain meaning" approach holding that Form 22C controls the determination of projected disposable income.  In so doing, it rejected the notion that the court should look at the actual or anticipated (rather than historical) income or the actual (rather than objective) expenses of the debtor.  The *Frederickson* case involved debtors who had the capacity to pay more than Form 22C required, but who were, according to the Bankruptcy Appellate Panel's determination, not required to do so in order to confirm their plan.  The converse situation was considered by Judge Federman in *In re Riding*, 377 B.R. 239 (Bankr. W.D. Mo. 2007).  In that case, the debtor's Form 22C calculation required them to make a payment to unsecured creditors pursuant to the plan that their Schedules I and J indicated that they could not afford to make.  The court held that the *Frederickson* holding was nonetheless applicable, the Form 22C calculation was dispositive and that if debtors were unable to make that payment, the plan was uncomfirmable.  As this Court has indicated before, the result in *Riding* is the logical consequence of the holding in *Frederickson*, applied to a different factual situation.  It is this application of the interpretation of the disposable income requirement in *Frederickson* to which the Debtors in this case object.

### B.  Projected Disposable Income and Equal Protection

#### 1. Debtors' Constitutional Argument

Debtors contend that the disposable income requirement contained in § 1325(b) as interpreted by the Bankruptcy Appellate Panel in *Frederickson* and applied in *Riding* results in

5

impermissible discrimination in violation of the equal protection requirement of the due process clause of the Fifth Amendment of the United States Constitution. Debtors' argument is premised first upon the assertion that the statutory provision as interpreted places Debtors in one of five categories as it regards their disposable income and ability to confirm a Chapter 13 plan. According to Debtors, the first classification consists of above-median debtors whose monthly net income (defined by Debtors as the difference between the income shown on Schedule I and the expenses shown on Schedule J) equals or exceeds their monthly disposable income (defined by Debtors as the result of the Form 22C calculation) plus required payments to secured and priority creditors. The second alleged classification consists of above-median debtors whose monthly net income is less than their monthly disposable income but whose plan draws no objection from the trustee or the holder of an unsecured claim. The third classification, the one into which the Debtors' factual situation places them, are above-median debtors whose monthly net income is less than monthly disposable income, but to whose plan the Chapter 13 Trustee or an unsecured plan has objected. The fourth classification consists of above-median debtors who are able to and propose to pay their unsecured creditors in full, thus making the disposable income requirements inapplicable. The fifth and final classification consists of below-median debtors who, according to Debtors, need not pay their unsecured creditors anything, an assertion which is incorrect, as the Court notes below. According to Debtors, all but class three are permitted to confirm a Chapter 13 plan. Debtors contend that this result is illogical.

The issue, therefore is whether § 1325(b) as interpreted and applied in the *Frederickson* decision impermissibly discriminates against above-median debtors unable to pay to unsecured creditors the amount reflected on Form 22C in violation of the equal protection requirement of the

due process clause of the Fifth Amendment of the United States Constitution. Alternatively, Debtors suggest that the Court might avoid the constitutional issue by adopting a different interpretation of the disposable income requirement. Specifically, Debtors argue first that to the extent the *Frederickson* court said that the Form 22C calculation is dispositive of the disposable income requirement for above-median debtors, it was dicta and need not be followed even if the decision were binding. Second, the Debtors point out that decisions of the Bankruptcy Appellate Panel are not binding on this Court and urge the Court not to follow the *Frederickson* result.

### 2. Interpretation of the Projected Disposable Income Requirement

The Court declines the Debtors' invitation to avoid the constitutional challenge they have raised by characterizing the commentary in *Frederickson* on calculating projected disposable income as dicta or by repudiating the case. First, the Court disagrees that the discussion in *Frederickson* about how to calculate projected disposable income for above-median debtors is dicta. Admittedly, the primary holding in the case is that debtors who lack disposable income have no projected disposable income and no applicable commitment requirement. They are not, according to the Bankruptcy Appellate Panel, obligated to pay any particular amount to their unsecured creditors under their Chapter 13 plan. In order to reach this issue, however, the Bankruptcy Appellate Panel had to determine that the debtors in the case before it actually lacked disposable income. In order to do that, the court had to determine the appropriate method for calculating the debtors' disposable income and projected disposable income. The debtors had contended that disposable income is determined by the calculations shown on the Form 22C and that that figure was dispositive. The Chapter 13 Trustee in the case had apparently argued that the court should look at the debtors' schedules of current income and expenditures, Schedules I

7

and J, which showed that the debtors had sufficient funds to make payments in excess of those proposed. The court rejected the Chapter 13 Trustee's contention and held that Form 22C is dispositive. Had it not done so, it would not have had to reach the question of the applicable commitment period. Accordingly, Debtors are incorrect in characterizing the court's comments about determining projected disposable income as dicta.

Second, the Court also declines the Debtors' invitation to avoid the question by simply repudiating this holding in *Frederickson*. As this Court has said before, decisions of the Bankruptcy Appellate Panel, while not binding on this Court, are persuasive. *In re Rush*, 387 B.R. 26, 31 (Bankr. W.D. Mo. 2008); *In re Gakinya*, 364 B.R. 366 (Bankr. W.D. Mo. 2007). The decision is on appeal to the Eighth Circuit Court of Appeals and this Court has determined to follow *Frederickson* until such time as the Eighth Circuit should provide different guidance on the question. Admittedly, *Frederickson* involves a different factual situation, one in which the debtors had the capacity to pay more than the Form 22C calculation would require them to pay. This case involves the opposite situation, in which the Debtors lack the funds necessary to make a payment to unsecured creditors in the amount required by the calculations shown on Form 22C. In that respect, it is identical to the factual situation presented to Judge Federman in *Riding*, which this Court has determined to follow. It has determined to follow *Riding* because, assuming the Bankruptcy Appellate Panel's holding in *Frederickson* is the appropriate way to determine projected disposable income for above-median debtors, *Riding* is the logical extension of that holding to debtors who have less actual income than their purported disposable income. There would be no statutory or other basis for holding differently in that situation.

Having declined the Debtors' invitation to avoid the constitutional challenge they offer by

8

adopting a different position on projected disposable income, the Court now turns to the equal protection questions raised by the Debtors.

### 3. Equal Protection Analysis

The United States Constitution requires that laws do not violate the equal protection rights of citizens. The Fifth Amendment states that "[no person shall] be deprived of life, liberty, or property, without due process of law." U.S. Const. Am. V. Although the due process clause of the Fifth Amendment does not specifically mention the phrase "equal protection," courts have uniformly held due process to include the right to equal protection. *See, e.g., Mathews v. DeCastro*, 429 U.S. 181, 182 n. 1 (1976); *Buckley v. Valeo*, 424 U.S. 1 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 768-770 (1975). The equal protection component of the Fifth Amendment prohibits the government from invidious discrimination. *Washington v. Davis*, 426 U.S. 229, 239 (1976). The Supreme Court's approach to Fifth Amendment equal protection claims is the same as its approach to equal protection claims under the Fourteenth Amendment. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 637 (1975).

When a statute is subject to an equal protection challenge, the level of judicial scrutiny varies with the type of classification utilized and the nature of the right affected. *City of Cleburne, Tex. V. Cleburne Living Center*, 473 U.S. 432 (1985). Three degrees of scrutiny are applied by the courts in analyzing statutes challenged under the Equal Protection Clause:

1. If a legislative classification disadvantages a "suspect class" or impinges upon the exercise of a "fundamental right," then the courts will employ strict scrutiny and the statute must fall unless the government can demonstrate that the classification has been precisely tailored to serve a

      compelling government interest;[1]

2. If the classification involves gender or legitimacy or restraints on certain kinds of protected speech, it will be treated under intermediate scrutiny and the statutory classification must serve substantial governmental objectives and must be substantially related to the achievement of those objectives in order to withstand such scrutiny; and[2]

3. If neither strict nor intermediate scrutiny is appropriate, then the statute will be tested for mere rationality, presumed to be valid and sustained if the classification is rationally related to a legitimate state interest.

S. Bufford and E. Chemerinsky, *Constitutional Problems in the 2005 Bankruptcy Amendments,* 82 Am. Bankr. L.J. 1, 4-5 (2008).

If a statute fails to implicate a fundamental right or affect a "suspect" class, it is subject to the rational basis test. The rational basis test in an equal protection challenge "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993). *See also, Dandridge v. Williams*, 397 U.S. 471,

---

[1] Examples of suspect classifications that require application of the strict scrutiny test include those based upon race, alienage and national origin. On race, *see Loving v. Virginia*, 388 U.S. 1, 11 (1967); *McLaughlin v. Florida*, 379 U.S. 184, 191-192 (1964); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). On alienage, *see Graham v. Richardson*, 403 U.S. 365, 372, (1971). On national origin, *see Oyama v. California*, 332 U.S. 633, 644-646 (1948); *Korematsu v. United States*, 323 U.S. 214, 216 (1944); *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943).

Examples of fundamental interests that require application of the strict scrutiny test include the right to vote, *Hunter v. Underwood*, 471 U.S. 222, 105 (1985); travel, *U.S. v. Guest*, 383 U.S. 745 (1966); privacy, *Roe v. Wade*, 410 U.S. 113, 152-153 (1973); due process in criminal matters, *Griffin v. Illinois*, 351 U.S. 12, 16-18 (1956); and specific guarantees in the Bill of Rights. *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205, 214-215 (1972) (freedom of religion).

[2] Between the extremes of rational basis test and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy. *See, e.g., Mississippi University for Women v. Hogan*, 458 U.S. 718, 723-724, and n. 9 (1982); *Mills v. Habluetzel*, 456 U.S. 91, 99 (1982); *Craig v. Boren*, 429 U.S. 190, 197 (1976); *Mathews v. Lucas*, 427 U.S. 495, 505-506 (1976).

486 (1970). Nor does it authorize "the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam). For these reasons, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. *See, e.g., Beach Communications*, 508 U.S. at 314-315; *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 462 (1988); *Hodel v. Indiana*, 452 U.S. 314, 331-332 (1981); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 314 (1976) (per curiam).

Courts determine that a statute overcomes the rational basis test of an equal protection challenge if: 1) some legitimate interest exists for the statute, and 2) the disparate treatment caused by the statute has a rational relationship to that legitimate interest. *See, e.g., Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992); *Dukes*, 427 U.S. at 303.[3] Further, a legislature that creates these categories need not "actually articulate at any time the purpose or rationale supporting its classification." *Nordlinger*, 505 U.S. at 15. *See also, e.g., United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980); *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 528 (1959). Instead, a classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Communications*, 508 U.S. at 313; *see also, e.g., Nordlinger*, 505 U.S. at 11; *Sullivan v.*

---

[3]Debtors suggest a different formulation for the rational basis test, citing *Johnson v. Robinson*, 415 U.S. 361 (1974) and several older Supreme Court cases and urge that there must be a *substantial* relation to a legitimate object of the legislation and the classification must be reasonable, not arbitrary. Debtors rely in part on *In re Keniston*, 85 B.R. 202 (Bankr. D.N.H. 1988). In that case, however, the bankruptcy court did not ultimately reach the constitutional question, adopting an interpretation of § 707(b) which avoided the question. While there is some language in Supreme Court precedent suggesting inconsistent formulations of the rational basis test, more recent opinions consistently apply the formulation suggested here in the rational basis context. *See, e.g., Nordlinger*, 505 U.S. at 10.

*Stroop*, 496 U.S. 478, 485 (1990); *Fritz*, 449 U.S. at 174-179; *Vance v. Bradley*, 440 U.S. 93, 111 (1979); *Dandridge v. Williams*, 397 U.S. 471, 484-485 (1970).  Thus, a court may conceive of a legitimate interest for the legislation in question if it is not readily apparent.  If rationally related to any conceivable legitimate interest, the legislation in question overcomes the rational basis test of an equal protection challenge.

### 4. Level of Equal Protection Scrutiny for Bankruptcy Laws

Bankruptcy laws challenged on equal protection grounds are subject to the rational basis test.  *See Stewart v. United States Trustee*, 175 F.3d 796, 812 (10th Cir. 1999).  The distinctions made by § 1325(b) between above-median debtors with actual income lower than projected disposable income and other debtors do not implicate a fundamental right nor affect a suspect class.  *See United States v. Kras*, 409 U.S. 434, 446 (1973) ("bankruptcy legislation is in the area of economics and social welfare" and "no constitutional right exists to obtain a discharge of one's debts in bankruptcy.").  Bankruptcy laws regulating economic activity do not involve constitutionally protected conduct and, thus, are subject to "a quite lenient test for constitutional sufficiency."  *In re Kelly*, 841 F.2d 908, 915 (9th Cir. C.A. 1988) (considering constitutionality of § 707(b)).  *See also Kras*, 409 U.S. at 446; *Otasco, Inc. V. United States*, 689 F.2d 162, 165 (10th Cir. 1982), *cert. denied*, 460 U.S. 1069 (1983).  Therefore, the rational basis test (rather than the strict or intermediate scrutiny test) must be applied to examine whether § 1325(b) overcomes an equal protection challenge.  Under the rational basis test, "[a] statute is presumed constitutional . . . and '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Heller v. Doe*, 509 U.S. 312, 320 (1993) (*quoting Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).  Further,

> [i]n the area of economics and social welfare, a State does not violate the Equal
> Protection Clause merely because the classifications made by its laws are
> imperfect. If the classification has some 'reasonable basis,' it does not offend the
> Constitution simply because the classification 'is not made with mathematical
> nicety or because in practice it results in some inequality.'

*Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78 (1911). "The problems of government are practical ones and may justify, if they do not require, rough accommodations – illogical, it may be, and unscientific." *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 68-70 (1913).

### 5. Analysis of Debtors' Constitutional Argument

Putting aside for the moment the question whether whatever differences in plan confirmation standards for groups of debtors survive scrutiny under the rational basis test, the Court concludes, after examining Debtors' purported classifications that this is not a case of classification at all, but rather of legislative line drawing, something inherent in all legislative enactments. Debtors' purported classifications are more illusory than real and some are based upon false assumptions. For example, Debtors' fifth classification consists of below-median debtors who, Debtors allege, have no projected disposable income commitment requirements at all. This statement is manifestly false. Like above-median debtors, below-median debtors are required to commit their projected disposable income for an applicable commitment period. This Court recently considered the question of determinating projected disposable income for below-median debtors and concluded that it is calculated by starting with current monthly income and subtracting the expenses shown on Schedule J, with certain adjustments. *Rush*, 387 B.R. at 32. While the Court also held in *Rush* that below-median debtors without disposable income have no applicable commitment period requirement, the same is true for above-median debtors, that being the principal holding in *Frederickson*. Thus, below-median debtors also have a disposable

13

income requirement. The formula for determining the required commitment and the length of time over which the payments must be made is different. The Debtors have not complained of the latter difference. As to the former, while the formula is different, it differs only on the expense side of the equation, the starting point for both debtors being the same – current monthly income. That observation reveals the Debtors' real complaint in this case, which is that Congress has chosen to use objective standards for expense deductions in arriving at disposable income rather than the Debtors' actual expenditures.

Certain other of the Debtors' purported classifications are so obviously rational that Debtors' objections melt away after even a superficial analysis. For example, Debtors' fourth classification consists of above-median debtors whose income permits them to pay their unsecured creditors in full. It is hardly irrational that Congress should permit Chapter 13 debtors who are capable of paying their unsecured creditors in full to confirm Chapter 13 plans. Likewise, Debtors' second classification consists of above-median debtors who lack the income necessary to pay their unsecured creditors the amount required by Form 22C, but to whose plans no objection is filed. It should be equally obvious that it is hardly irrational for Congress to permit such plans to be confirmed when parties with an economic interest in the Debtors' proposal choose not to raise an available objection. This situation is hardly unique to Chapter 13 confirmation or to bankruptcy proceedings. The courts often grant relief to parties requesting it when no other party in interest with standing objects, even though some statutory basis to do so might exist.

Eliminating these classifications reduces the case to one in which above-median debtors who are capable of paying to their unsecured creditors the amount shown necessary by the

14

calculations performed on the Form 22C may have their plans confirmed and those who cannot, do not. This is less a classification than a threshhold standard. Debtors whose income permits them to make a payment at or above that level may confirm their plans; debtors who do not will have confirmation of their Chapter 13 plans denied. As noted above, for all debtors this determination starts with the calculation of current monthly income. There is no discrimination or differential treatment except insofar as some debtors may use their actual expenses and others are bound by the objective standards set forth in § 707(b)(2). Even then, above-median debtors are not irrevocably tied to those numbers. Congress has incorporated into § 707(b)(2) several instances in which the court may allow amounts in excess of the IRS standards or make additional allowances if properly documented and proven to be reasonable and necessary. *See, e.g.,* § 707(b)(2)(A)(ii)(I) (additional allowance of 5% for food and clothing); § 707(b)(2)(A)(ii)(II) (continuation of expenses for support of certain elderly, ill or disabled persons); § 707(b)(2(A)(ii)(IV) (additional allowance for educational expenses of children under 18 years of age); § 707(b)(2)(A)(ii)(V) (additional allowance for home energy costs). In addition, Debtors also have the opportunity to argue that their actual expenses in excess of the amounts specified in § 707(b)(2)(A) should be allowed if they can meet the substantive and procedural requirements of demonstrating special circumstances as permitted by § 707(b)(2)(B). Debtors also fail to show how they are harmed by the differential treatment relating to allowability of expenses. It has been this Court's experience that the deductions permitted by the IRS National and Local Standards and the other provisions of § 707(b)(2) are often more generous than debtors' actual expenses. In

15

fact, this is true of the Debtors in this case as well.[4]

Much has been written about the policy choices reflected in BAPCPA and the quality of the legislative drafting. This Court will not add to the rhetoric. As noted above, the lack of clarity in the amendments relating to disposable income in Chapter 13 has generated competing views as to the income commitment requirements for debtors in Chapter 13 cases. Whichever approach is employed, difficult problems are encountered and anomalous results may occur. While there is much to criticize about the provisions, this Court does not believe it can be said that in adopting objective standards for the determination of expenses allowed to above-median Chapter 13 debtors Congress acted without a legitimate purpose or that the standards employed are not rationally related to that purpose. As noted above, the Supreme Court has said that the legislature need not necessarily articulate those purposes if they can be divined by the court. This Court can identify at least two conceivable purposes for adopting these objective standards to limit expense deductions allowed to above-median Chapter 13 debtors – limiting judicial discretion and establishing a threshhold level of recovery for unsecured creditors.

It is apparent that in many respects BAPCPA was designed to limit the discretion of bankruptcy judges. Nowhere is this more apparent than in the means test embodied in § 707(b)(2) as incorporated into Chapter 13 for above-median debtors by § 1325(b)(3). *See, e.g., In re Gress*, 344 B.R. 919, 922 (Bankr. W.D. Mo. 2006) ("in enacting the means test, Congress

---

[4]The expense deductions permitted Debtors pursuant to calculations contained in Parts IV, V and VI of Form 22C total $6,597.98. The expenses shown on their Schedule J equal $4,652.07. Some adjustments are required to equate the two because different categories of items are shown on the 22C form and Schedule J. For example, the Schedule J expenses do not include items shown on Schedule I as deductions to arrive at net income, such as taxes, insurance and payment of a loan from the husband's 401K account. The 22C form also contains allowances for payment of secured debt which (with the exception of a $141.07 automobile debt payment) are not shown on Debtors' Schedule J. Adding the payroll deductions into Schedule J and deducting the automobile debt payment shows total expenses of $6,149.97. Deducting the secured debt payments from Form 22C yields a total of $6,263.58, a sum slightly in excess of the comparable figure on Schedule J, as adjusted.

intended to take away discretion from the courts as to higher income debtors, who were seen as abusers of the system"). The Hon. Keith M. Lundin, *Ten Principles of BAPCPA: Not What Was Advertised*, 24-7 Amer. Bankr. Inst. J. 1, 69 (September 2005) ("BAPCPA is packed with provisions intended to "reduce the discretion" of bankruptcy judges."); Rafael I. Pardo, *Eliminating the Judicial Function in Consumer Bankruptcy,* 81 Am. Bankr. L.J. 471, 472-73 (2007) ("the means test evinces a deep mistrust of the pre-BAPCPA discretion that had been exercised by the bankruptcy judiciary in its gatekeeper role under the substantial abuse dismissal regime.") Under the previous regimen, bankruptcy courts had complete discretion to determine whether any given type of expense was necessary and whether the amount proposed to be spent was reasonable. Congress has apparently decided, at least for above-median debtors with a greater ability to pay, that objective limitations should be placed upon the debtors' expenses in various categories and that the IRS National and Local Standards serve as a reasonable model for such limitations. While one can argue whether these limitations were necessary, this Court does not believe it can be said that imposing limits on expense deductions for higher income debtors is not a legitimate governmental purpose. Neither can it say that adopting the IRS Standards is not rationally related to that purpose. Imposition of limits on expenses is directly related to and effectively implements Congress' intention to limit the discretion of bankruptcy judges.

While not necessarily designed to maximize recoveries to unsecured creditors, the incorporation of these standards into determination of disposable income in Chapter 13 cases does establish threshhold levels of recovery for unsecured creditors by limiting available expenses. Clearly, this is also a legitimate purpose. While experience has demonstrated that utilizing these fictional numbers rather than the debtors' real numbers produces anomalous results in some cases,

the Court cannot say that the use of the standards is not rationally related to Congress' desire to insure that higher income debtors limit their expenses to purported reasonable levels in order to enhance the likelihood of a certain level of recovery for unsecured creditors.  While the IRS Standards are not employed in precisely the same context, the IRS does utilize them to judge the reasonableness of expenditures by delinquent taxpayers and to determine a surplus amount in the debtors' monthly budget that might be used to defray delinquent taxes.  The process of determining how much a Chapter 13 debtor should be permitted to expend on various recurring monthly expenses and other items in order to derive a sum to be paid to unsecured creditors is at least a similar one.  Finally, the fact that the Court is authorized to deviate from the IRS standards in certain categories if justified and documented and that additional allowances can be made if special circumstances can be shown makes it that much more difficult to conclude that this legislative scheme is irrational.  The Court cannot, therefore, say that the adoption of these standards is not rationally related to the objective.  As the court observed in *In re Sparks*, 360 B.R. 224, 228 (Bankr. E.D. Tex. 2006):

> [i]n applying these § 707(b) standards only to Chapter 13 debtors whose current monthly income exceeds the median income of persons in their state, Congress implicitly recognized that without the invocation of appropriate limitations, a higher level of monthly income enjoyed by a Chapter 13 debtor would likely be consumed in a lifestyle characterized by a higher level of monthly expenditures. Thus, in an effort to insure that a significant payment to unsecured creditors would actually be made by those persons whose monthly income reflected such an ability, Congress incorporated the § 707(b) standards into § 1325(b)(3) as a

statutory ceiling for those enumerated expenses categories, thereby precluding the allowance of any improper discretionary spending by higher income debtors in Chapter 13.

Debtors identify a number of potential objectives served by incorporation of the IRS standards into the disposable income determination in Chapter 13 and then to seek to debunk each of those proposed objectives, essentially setting up straw men and knocking them down. Having identified two legitimate objectives to which the adoption of these standards is rationally related, the Court need not and will not respond to the Debtors' discussion of hypothetical objectives.

The Court is well aware of the potential harmful consequences of the inability of seemingly needy debtors to obtain Chapter 13 relief. The Court is also aware of the somewhat anomalous outcome which can result under the amendments as interpreted above. Ultimately, however, the Debtors' challenge is to the logic and wisdom of the Congressionally chosen method for determination of disposable income for above-median Chapter 13 debtors. The Court is not at liberty to second guess the legislature. It must employ well-established principles of constitutional and statutory interpretation. Under those principles, economic legislation is entitled to substantial deference and cannot be invalidated unless the objectives are illegitimate or the means employed not rationally related to those objectives. The formulas adopted in BAPCPA for determining both income and expenses for above-median debtors result in a far from perfect fit in assessing their actual ability to pay. However, as the Supreme Court has consistently said, in this area, perfect fits are not required. Congress apparently had considerable unease with the way in which the bankruptcy courts had exercised their discretion in determining what were reasonable and necessary expenses for higher income Chapter 13 debtors. While that suspicion

may not have been warranted, it cannot be said to be illegitimate for Congress to limit judicial discretion. Adoption of objective standards placing limits on expenses (and consequently also on discretion) is a rational means of achieving that goal. Nor is it irrational for Congress to have decided the group of debtors upon which expense limitations might be necessary is those with higher incomes and therefore a greater ability to pay. The Internal Revenue Service standards, employed in an analogous context and buffered by a limited degree of additional flexibility cannot be said to be an irrational way of limiting those expenses.

For all the reasons stated above, the Court rejects the Debtors' equal protection challenge to the disposable income requirements imposed on above-median debtors as interpreted by the Bankruptcy Appellate Panel in *Frederickson* and applied by this Court in *Riding* and, therefore, grants the Trustee's Motion to Deny Confirmation.

DATED:  September 3, 2008                    /s/ Dennis R. Dow
                                             HONORABLE DENNIS R. DOW
                                             UNITED STATES BANKRUPTCY JUDGE